**Joshua B. Taylor, ISB# 7301**
The Law Office of Joshua B. Taylor, PLLC
250 S. 5th St., Ste. 850
Boise, ID 83702
t: 208-336-1880
f: 208-429-1100
e: joshuabtaylorlaw@gmail.com

*Attorney for Reed Alden Siddoway*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
(HONORABLE B LYNN WINMILL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No: 1:21-CR-00205-BLW |
| | ) | |
| Plaintiff, | ) | **MOTION TO DISMISS COUNT TWO OF** |
| | ) | **THE SUPERSEDING INDICTMENT** |
| vs. | ) | |
| | ) | |
| REED ALDEN SIDDOWAY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Motion to Dismiss 18 U.S.C. § 922(g)(1) (Count Two)**
**Under the Second Amendment**

The Supreme Court's recent opinion in *New York State Rifle & Pistol Association,*
*Inc. v. Bruen*, 142 S. Ct. 2111 (2022), marked a dramatic shift in Second Amendment law.
Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of
the government's interest in firearm regulation against the degree of infringement on the
challenger's right to keep and bear arms. *Bruen* rejected that approach, instructing courts,
instead, to consider only "constitutional text and history." 142 S. Ct. at 2128-29. If "the
Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the
Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the
presumption, the government must show that a challenged law "is consistent with the
Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The test for historical

1

consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted.

Under the new framework mandated by *Bruen*, the Court should dismiss Count Two of the Superseding Indictment against Mr. Siddoway, which charges him with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). Because possession of a firearm comes within the Second Amendment's "plain text," Mr. Siddoway's conduct is presumptively protected. And the government will be unable to rebut that presumption. Felon-disarmament laws, which did not appear in the United States until the 20th century, were unknown to the generation that ratified the Second Amendment.

Count Two must be dismissed.[1]

I.    **Procedural History**

On August 10, 2021, a grand jury in the District of Idaho returned a two-count indictment against Mr. Siddoway.[2]  Dkt. 1.  Count One of this original two-count indictment charged Mr. Siddoway with "possession with intent to distribute methamphetamine" in violation of 21 U.S.C. §841(a)(1) and (b)(1)(B), and Count Two charged Mr. Siddoway with "unlawful possession of ammunition" in violation of 18 U.S.C. § 922(g)(1).  On November 24, 2021, Mr. Siddoway was arraigned on the August 10, 2021 indictment.  The defense requested continuances on January 7, 2022; March 21, 2022; and June 29, 2022.  All three continuances were granted.  On August 9, 2022, the government

---

[1] Unless otherwise indicated, case quotations in this motion omit citations, brackets, internal quotation marks, and other characters that do not affect the meaning of the cited language.

[2] The August 10, 2021 indictment also included "Criminal Forfeiture Allegations", not discussed here.

filed, and the grand jury returned, a Superseding Indictment.  Mr. Siddoway was arraigned

on the Superseding Indictment on August 17, 2022.  The Superseding Indictment amended

Count One from a violation of 21 U.S.C. § 841(a)(1) and **(b)(1)(B)** to a violation of

**(b)(1)(A)**; it further amended Count Two from "unlawful possession of ammunition" to

"unlawful possession **of a firearm** and ammunition" and added the language "did

knowingly possess, in and affecting commerce, a firearm and ammunition, to wit: one AR-

15 style rifle, bearing no serial number, with principal component parts having been

shipped and transported in interstate and foreign commerce".  Dkt. 30.

Mr. Siddoway now moves to dismiss Count Two of the Superseding Indictment.

## II.     Legal Background

### A.      Before *Bruen*, lower courts assessed Second Amendment challenges by applying means-ends scrutiny.

The Second Amendment provides, "A well regulated Militia, being necessary to the

security of a free State, the right of the people to keep and bear Arms, shall not be

infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court

held the Second Amendment codified a pre-existing individual right to possess and use

firearms for lawful purposes like self-defense. 554 U.S. 570, 592, 624 (2008). The Court

canvassed "the historical background of the Second Amendment," including English

history from the 1600s through American independence, colonial law and practice leading

up to and immediately following 1791, and evidence of how the Second Amendment was

interpreted in the century after its enactment (e.g., legal treatises, pre-Civil War case law,

post-Civil War legislation, and late-19th-century commentary). *Id.* at 592-619. Based on

this survey, the Court concluded the right protected by the Second Amendment is "not

limited to the carrying of arms in a militia." *Id.* at 586. Rather, "the Second Amendment

confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at

581, 622. The Court therefore struck down District of Columbia statutes that prohibited the

possession of handguns in the home and required that any other guns in the home be kept

inoperable. *Id.* at 628-34.

Two years after *Heller*, in *McDonald v. City of Chicago*, the Court reaffirmed

*Heller*'s "central holding": that "the Second Amendment protects a personal right to keep

and bear arms for lawful purposes, most notably for self-defense within the home." 561

U.S. 742, 780 (2010). In holding that the Second Amendment applies against the states as

well as the federal government, the Court described the right to keep and bear arms as

"fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history

and tradition." *Id.* at 767. And that right, the Court warned, should not be treated "as a

second-class right, subject to an entirely different body of rules than the other Bill of

Rights guarantees." *Id.* at 780.

After *Heller* and *McDonald*, the Courts of Appeals "coalesced around a 'two-step

framework" which the Supreme Court in *Bruen* rejected:

> In Heller and McDonald, we held that the Second and Fourteenth
> Amendments protect an individual right to keep and bear arms for
> self-defense. In doing so, we held unconstitutional two laws that
> prohibited the possession and use of handguns in the home. In the
> years since, the Courts of Appeals have coalesced around a "two-
> step" framework for analyzing Second Amendment challenges
> that combines history with means-end scrutiny.
>
> Today, we decline to adopt that two-part approach. In keeping
> with Heller, we hold that when the Second Amendment's plain
> text covers an individual's conduct, the Constitution
> presumptively protects that conduct. To justify its regulation, the
> government may not simply posit that the regulation promotes an
> important interest. Rather, the government must demonstrate that
> the regulation is consistent with this Nation's historical tradition
> of firearm regulation. Only if a firearm regulation is consistent

> with this Nation's historical tradition may a court conclude that
> the individual's conduct falls outside the Second Amendment's
> "unqualified command."

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843, 2022 U.S. LEXIS 3055, at *20-21.

In *Bruen*, the Court went on to state, "Despite the popularity of this two-step approach, it is one step too many." Id. at 22-23. Finding that: "Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." Id. And further finding that, "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." Id. And then firmly placing the burden on the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id. The government cannot meet this burden.

**B.      *Bruen* replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history."**

The Supreme Court's recent opinion in *Bruen* disavowed the lower courts' framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S. Ct. at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138.

That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* Answering this threshold question in *Bruen* was straightforward. At issue there was a New York law providing that, to obtain a permit to carry a handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protects

[the petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively guarantees" a right to carry firearms in public, and New York's "proper cause" requirement, which burdened that right, could pass constitutional muster only if the government overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation

is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136.[3]

Courts may look to the tradition of firearms regulation "before . . . and even after the

founding" period, but they should do so with care. *Id.* at 2131-32. The Court cautioned, for

example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope

of the [Second Amendment] right if linguistic or legal conventions changed in the

intervening years." *Id.* at 2136. Courts should not "rely on an ancient practice that had

become obsolete in England at the time of the adoption of the Constitution and never was

acted upon or accepted in the colonies." *Id.*

Conversely, courts must "guard against giving postenactment history more weight

than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted

from immediately after its ratification through the end of the 19th century represent[s] a

critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes

from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we

recognized in *Heller* itself, because post-Civil War discussions of the right to keep and

bear arms took place 75 years after the ratification of the Second Amendment, they do not

provide as much insight into its original meaning as earlier sources."). Evidence from "the

mid- to late-19th-century" provides little "insight into the meaning of the Constitution in

[1791]." *Id.* Courts should therefore credit such history to the extent it provides

"confirmation" of prior practice with which it is consistent, but should otherwise afford it

little weight. *Id.* After all, "post-ratification adoption or acceptance of laws that are

*inconsistent* with the original meaning of the constitutional text obviously cannot overcome

---

[3] The Court reserved the question whether courts entertaining challenges to state
statutes should examine history as of 1868, when the Fourteenth Amendment was adopted.
*Id.* at 2137-38.

or alter that text." *Id.* (emphasis in original); *see also id.* ("[T]o the extent later history

contradicts what the text says, the text controls.").

The Court in *Bruen* held that because New York could not point to a robust tradition

of regulations similar to the "proper cause" requirement, the state's statute violated the

Second Amendment. *Id.* at 2138-56. In reaching that conclusion, the Court did not

elaborate a comprehensive scheme for evaluating historical evidence, but it did stake

certain guideposts for lower courts to follow. The Court said, for instance, that "[i]n some

cases," the historical inquiry "will be fairly straightforward":

> [W]hen a challenged regulation addresses a general societal problem that has
> persisted since the 18th century, the lack of a distinctly similar historical
> regulation addressing that problem is relevant evidence that the challenged
> regulation is inconsistent with the Second Amendment. Likewise, if earlier
> generations addressed the societal problem, but did so through materially
> different means, that also could be evidence that a modern regulation is
> unconstitutional. And if some jurisdictions actually attempted to enact
> analogous regulations during this timeframe, but those proposals were
> rejected on constitutional grounds, that rejection surely would provide some
> probative evidence of unconstitutionality.

*Id.* at 2131; *see also id.* (explaining that if "the Founders themselves could have adopted" a

particular regulation "to confront" "a perceived societal problem," but did not do so, then

that regulation is unconstitutional today).

In "other cases," challenged statutes will "implicat[e] unprecedented societal

concerns or dramatic technological changes," which "may require a more nuanced

approach." *Id.* at 2132. When firearms pose "regulatory challenges" that are "not . . . the

same as those that preoccupied the Founders in 1791," the "historical inquiry that courts

must conduct will often involve reasoning by analogy." *Id.*; *see also id.* (directing courts to

use "analogical reasoning" when confronting "present-day firearm regulations" that "were

unimaginable at the founding"). Deciding "whether a historical regulation is a proper

analogue for a distinctly modern firearm regulation requires a determination of whether the

two regulations are relevantly similar." *Id.* The Court in *Bruen* declined to "provide an

exhaustive survey of the features that render regulations relevantly similar under the

Second Amendment," but it did identify "at least two metrics: how and why the regulations

burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words,

"whether modern and historical regulations impose a comparable burden on the right of

armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e.,

the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133

(emphasis in original).

> The Court also stressed the limits of reasoning by analogy:

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* (emphasis in original).

Whether based on "distinctly similar" precursors or merely historical analogues, the

"comparable tradition of regulation" must be robust. *See id.* (requiring "a well-established

and representative" historical analogue); *id.* at 2137 (explaining that "a governmental

practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" *if*

that practice "has been open, widespread, and unchallenged since the early days of the

Republic"). A handful of "outlier[]" statutes or cases from a small number of "outlier

jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156.  Moreover, even if

certain statutes were widespread, courts should not consider them determinative unless the

historical record reveals the statutes were actually enforced. *See id.* at 2149 (dismissing surety laws because "respondents offer little evidence that authorities ever enforced [those] laws").

### III.    Argument

Under the framework announced in *Bruen*, § 922(g)(1) violates Mr. Siddoway's Second Amendment right to keep and bear arms. The amendment's "plain text" does not differentiate between convicted felons and other members of "the people," and a total prohibition on firearm possession by felons therefore presumptively violates the Second Amendment. The government will be unable to rebut that presumption. Felon-disarmament laws, which did not appear in this country until the 20th century, were unknown to the founding generation. There was no "historical tradition," as of 1791, barring felons from possessing firearms, and more recent legislative enactments cannot supplant the understanding of the right to keep and bear arms that prevailed when the Second Amendment was enacted.

*Bruen* directs courts to begin the Second Amendment analysis by asking whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. The answer to that question is not difficult in Mr. Siddoway's case. The Second Amendment protects the right of "the people" to "keep and bear arms." Possession of a firearm, the conduct proscribed by § 922(g)(1), easily qualifies as "keep[ing]" and "bear[ing]" arms. *See Heller*, 554 U.S. at 628-29 (holding statute that barred possession of handguns in the home unconstitutional).

Likewise, Mr. Siddoway is part of "the people" within the meaning of the Second Amendment. Just as that amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, it does not draw a

felon/non-felon distinction. "Nothing in the Second Amendment's text" suggests that those who have been convicted of a felony are unentitled to the amendment's protection. *Id.*

*Heller* supports this conclusion. Construing the words "the people" in that case, the Court said "the term unambiguously refers to *all* members of the political community, *not an unspecified subset*." *Heller*, 554 U.S. at 580 (emphasis added). The Court determined that the Second Amendment right—like the rights of "the people" in the First, Fourth, Ninth, and Tenth Amendments—"is exercised individually and belongs to *all* Americans." *Id.* (emphasis added); *see also Bruen*, 142 S. Ct. at 2156 ("The Second Amendment guaranteed to *all Americans* the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." (emphasis added)). Interpreting "the people" to exclude felons would conflict with that principle.

Because "the Second Amendment's plain text covers Mr. Siddoway's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. To rebut the presumption, the government must establish that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The "general societal problem" that § 922(g)(1) is designed to address—i.e., ex-felons with access to guns—is one "that has persisted since the 18th century." *Id.* at 2131. As a result, § 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar historical regulation[s]" as of 1791, when the Second Amendment was ratified. *Id.* The government will be unable to make that showing.

What is today § 922(g)(1) traces its origins to 1938, when Congress passed a statute, the Federal Firearms Act, prohibiting certain felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250,

11

1251 (1938)). At that time, the statute "covered only a few violent offenses," *id.*,

prohibiting firearm possession by those convicted of crimes such as murder, rape,

kidnapping, and burglary, *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). It was

not until 1961 that Congress amended the statute to prohibit "possession by *all* felons."

*Skoien*, 614 F.3d at 640 (emphasis in original) (citing Pub. L. 87–342, 75 Stat. 757). Seven

years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving

18 U.S.C. § 922(g)(1) its current form." *Id.* Thus § 922(g)(1) "is firmly rooted in the

twentieth century," *Booker*, 644 F.3d at 24 – a century and a half after adoption of the

Second Amendment.  Such recent regulations cannot establish a historical tradition unless

they "confirm[]" earlier practice. *Bruen*, 142 S. Ct. at 2137. Indeed, in *Bruen* the Court said

it would not even "address any of the 20th-century historical evidence brought to bear by

respondents or their *amici*," since such evidence "does not provide insight into the meaning

of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

Even if the Court broadens its focus to consider state statutes as well, § 922(g)(1)

"bears little resemblance to laws in effect at the time the Second Amendment was ratified."

*N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012). In 2007, Robert H. Churchill, a history

professor at the University of Hartford, undertook "a full survey of printed session laws

pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815."

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in*

*Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139,

143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between

1607 and 1815 did the colonial or state governments of what would become the first

fourteen states exercise a police power to restrict the ownership of guns by members of the

body politic." *Id.* at 142. Carlton Larson, a professor at the University of California-Davis School of Law, has written that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009).

Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009). It appears New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. *Id.* No other state passed a felon-disarmament law until 1923. *Id.*; *see also* Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (noting "the absence of historical support for the claim that [felon-disarmament laws] are consistent with the preexisting right to arms"); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) ("[P]rohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in response to a crime wave following the First World War."); *accord N.R.A.*, 700 F.3d at 197 ("[A] strictly originalist argument for . . . bans on firearm possession by felons . . . is difficult to make.").

13

In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(1). *Bruen*, 142 S. Ct. at 2130-31. The "Founders themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by violent felons. *Id.* at 2131. But they declined to do so, and that inaction indicates § 922(g)(1) "[i]s unconstitutional." *Id.*

The government cannot attempt to justify § 922(g)(1) by resorting to "analogical reasoning." *Id.* at 2132. According to *Bruen*, that mode of analysis is available only when a Second Amendment challenge "implicat[es] unprecedented societal concerns," "dramatic technological changes," or "modern regulations that were unimaginable at the founding." *Id.* But the potential danger posed by felons' access to firearms would have been neither unprecedented nor unimaginable to the Founders. As a result, the government cannot rebut the presumption of unconstitutionality by identifying a "historical analogue" to § 922(g)(1). *Id.* at 2133.

Even if analogical reasoning were appropriate in this case, however, it would not aid the government. There appears to be no historical tradition of founding-era statutes that are "relevantly similar" to § 922(g)(1). *Id.* at 2132. The government will therefore be unable to shoulder its burden of rebutting the presumption of unconstitutionality.

IV.     **Conclusion**

Section 922(g)(1) violates the Second Amendment as it was understood at the time

of its adoption. The Court should therefore dismiss count Two of the Superseding

Indictment.

Respectfully submitted,


_____/s/_____
Joshua B. Taylor


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 29, 2022, I caused to be served to the parties

indicated below a true and correct copy of this document in the following manner:

| | |
|---|---|
| United States Attorney's Office<br>District of Idaho<br>David James Morse<br>David.morse@usdoj.gov | [ ] first-class mail<br>[ ] hand delivery<br>[ ] fax<br>[ X ] cm/ecf filing<br>[ ] email |

/s/ Josh Taylor
Joshua B. Taylor